# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

JUANITA CARPENTER,

*Plaintiff,*

v.

RAPPAHANNOCK RAPIDAN COMMUNITY SERVICES BOARD AND AREA AGENCY ON AGING,

*Defendant.*

No. 3:11–cv–00017

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Pending before the Court in this 42 U.S.C. § 1983 action for deprivation of property without due process of law is Defendant's Motion for Summary Judgment. (docket no. 36). The matter is fully briefed, and the Court conducted a hearing on November 14, 2011 in Charlottesville, VA. For the reasons stated herein, I will deny Defendant's Motion in part and grant it in part.

## I. BACKGROUND

The facts are alleged as follows. Defendant Rappahannock Rapidan Community Services Board and Area Agency on Aging ("RRCSB") hired Plaintiff Juanita Carpenter ("Plaintiff" or "Carpenter") in 1995. Am. Compl. ¶ 4. In 2006, Plaintiff became a qualified mental health provider in RRCSB's Visions Community Support Services Division.[1] Am. Compl. ¶ 3. Plaintiff held that position until her termination on April 19, 2010. *Id.*

[1] The Visions program provides support services to individuals with serious mental illnesses. Def.'s Mem. 2.

In the months leading up to her dismissal, Plaintiff received two disciplinary notices. She received a "Group I" notice on February 25, 2010 for "[u]nsatisfactory job performance – unprofessional, non recovery-based interaction with members[2] and staff." *See* Def.'s Mem. Ex. 8. She received a more severe "Group II" notice on March 8, 2010 for failing to report suspected abuse of a member. Def.'s Mem. 3. Plaintiff refused to sign each notice.

From April 9, 2010 until April 18, 2010, Plaintiff was on vacation and did not work. Am. Compl. ¶ 11. On April 13, 2010, Terri Buchman, who was Plaintiff's supervisor, issued (that is, drafted and signed) a second Group II[3] written notice to Plaintiff describing "continued unsatisfactory job performance – unprofessional, non recovery-based interaction with members." *See* Def.'s Mem. Ex. 7. According to Defendant, this second Group II notice was issued because, on April 6, 2010, Plaintiff reportedly berated members over their lack of sales or purchases of certain raffle tickets. Def.'s Mem. 2. On April 19, Brian Duncan, RRCSB's Executive Director, issued (again, that is, drafted and signed) a termination letter to Plaintiff, stating that because she had two active Group II notices and an active Group I notice, she was being terminated in accordance with Human Resources Policy # 8002. Am. Compl. ¶ 10; *see* Def.'s Mem. Ex. 5 at 2 (outlining RRCSB's Corrective Action policy, which states that "[t]wo Group II Offenses result in termination.").

Because Plaintiff was on vacation, she did not see her April 13, 2010 Group II notice until she received it along with her termination letter during a meeting with her supervisors on April 19, 2010. Am. Compl. ¶ 10. Plaintiff claims to have received no specific information

[2] RRCSB refers to the individuals it serves as "members." Def.'s Mem. 2.

[3] According to Defendant's Memorandum and argument at the November 14 hearing, supervisors at RRCSB initially contemplated giving Plaintiff a second Group I notice, but after a review of Plaintiff's personnel file, her superiors decided that the more serious Group II notice was warranted. *See* Def.'s Mem. 4.

regarding her alleged unsatisfactory performance or unprofessional interaction with members, and she claims that she was not given an opportunity to respond to the allegations. *Id.*

After her termination, Plaintiff filed a grievance and proceeded through three of the four steps of the RRCSB grievance procedure; the agency action was upheld at all three steps. Am. Compl. ¶ 12. Seeking to proceed to step four, Plaintiff requested that the grievance be qualified for a hearing before an impartial Hearing Officer; however, the RRCSB, through Executive Director Duncan, terminated the grievance process because Plaintiff had not complied with the required timeline. *Id.* Plaintiff asserts that before her grievance could be terminated, Virginia Code Section 15.2–1507(7)(a) required Duncan to provide her with written notification of the alleged timeliness violations and give her five workdays to correct the noncompliance. Am. Compl. ¶ 13. Duncan, however, provided no such notification. *Id.* After Duncan terminated the grievance process, Plaintiff elected not to appeal that decision to the circuit court, as permitted by Virginia Code Section 15.2–1507(7)(b). Def.'s Mem 7. Instead, Plaintiff filed the instant lawsuit. *Id.*

As an employee of a governmental agency, Plaintiff claims that she had a protected property interest in her job and was entitled to a pretermination hearing. Am. Compl. ¶¶ 14–15. Plaintiff seeks (1) a declaratory judgment that Defendant violated the Constitution, (2) injunctive relief in the form of reinstatement to a position of equal duties and responsibilities, (3) compensatory and punitive damages, (4) costs and attorney's fees, and (5) any further relief this Court deems necessary and proper. Am. Comp. ¶ 19. Defendant does not dispute Plaintiff's assertion that she had a property interest in her continued employment, Def.'s Mem. 2 n.1, but instead argues that Plaintiff received all the process that she was due, Def.'s Mem. 2, and now seeks summary judgment in its favor.

## II. Applicable Law

When no material facts are genuinely in dispute, summary judgment may be granted if, applying the applicable law to the facts, judgment should be entered for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). For purposes of summary judgment, a genuine dispute exists if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court considers a motion for summary judgment, the non-movant is entitled to have the facts viewed in a light most favorable to her, and also to have reasonable inferences drawn in her favor. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

When it comes to a public employee's due process claim, "[a]n essential principle of due process is that a deprivation of . . . property 'be *preceded by* notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)) (emphasis added); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972) ("This principle requires 'some kind of hearing' *prior to the discharge* of an employee who has a constitutionally protected property interest in his employment.") (emphasis added); *Boddie v. Conn.*, 401 U.S. 371, 379 (1971) (noting that the "root requirement" of the Due Process Clause is that "an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."). The Court in *Loudermill* recognized the need for a pretermination hearing in the public employment context[4] after balancing the competing interests at stake, which include "the

[4] The *Loudermill* Court did mention, in a footnote, that "[t]here are . . . some situations in which a postdeprivation hearing will satisfy due process requirements." *Loudermill*, 470 U.S. at 542 n.7 (citing *Ewing v. Mytinger & Casselberry*, 339 U.S. 594 (1950) (holding that the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 334(a), as amended, which permitted seizures of misbranded articles without a hearing, did not violate due process principles, given the risk presented to public health by such misbranded articles) and *N. Am. Cold Storage Co. v. City of Chi.*, 211 U.S. 306 (1908) (finding, on the basis of public health concerns, that a pre-seizure hearing was not necessary before authorities could seize and destroy unwholesome or putrid food)). *See also Hudson v. Palmer*, **<continued>**

private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination." *Loudermill*, 470 U.S. at 542–43 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The pretermination hearing, while necessary, need not be elaborate or formal. *Id.* at 545. "Something less than a full evidentiary hearing is sufficient . . . ." *Id.* (internal quotation marks and citation omitted). In the context of a public employee's termination, the hearing need not "definitively resolve the propriety of a discharge." *Id.* Rather, "[w]hen post-termination administrative procedures are afforded, such pretermination procedure functions only as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs*, 964 F.2d 1436, 1439 (4th Cir. 1992) (quoting *Loudermill*, 470 U.S. at 545–46)*; see Bell v. Burson*, 402 U.S. 535, 540 (1971). Requiring something more than this before termination would intrude on the government's interest in terminating an unsatisfactory employee. *Loudermill*, 470 U.S. at 546.

## III. DISCUSSION

### A. Pretermination Events

Defendant claims that the material facts are not in dispute, Def.'s Mem. 1, but Plaintiff disagrees, and specifically disputes the Defendant's characterization of the relevant chronology, Pl.'s Opp'n 4. While Defendant admits that Plaintiff had a protected property interest in her job,

**<continued>** 468 U.S. 517, 533 (1984) (noting that intentional deprivations of a prisoner's property rights do not violate the Due Process Clause, provided that adequate state post-deprivation remedies are available). Each of the aforementioned scenarios, however, is distinguishable from the run of the mill public termination case, given the public safety risk involved in spoiled food and mislabeling in *Ewing* and *Cold Storage* and the impracticability of providing a hearing before random and unauthorized intentional deprivations by state employees in *Hudson*. Carpenter's continued public employment, by contrast, posed no public safety risk, and her termination was not a random and unauthorized act for which a predeprivation hearing was impractical.

Defendant argues that under *Loudermill*, Plaintiff "received all the process she was due . . . ." Def.'s Mem. 2. I find that the facts surrounding the timing of Plaintiff's April 19, 2010 termination are clearly in dispute, and Plaintiff's claim regarding her pretermination rights survives summary judgment.

Defendant describes the relevant facts as follows. On April 19, RRCSB's Human Resources Director Katia Luna and Visions Coordinator Sallie Morgan met with Plaintiff for approximately thirty minutes after Plaintiff had returned from a vacation. Def.'s Mem. 5. At the beginning of that meeting, Luna presented Plaintiff with her most recent Group II written notice. *Id.* Morgan then provided Plaintiff with details of the incident and discussed past incidents of Plaintiff acting unprofessionally and speaking inappropriately to others. *Id.* Defendant avers that during this meeting, Plaintiff was given the opportunity to respond to the Group II notice. *Id.* Plaintiff essentially responded only by stating that "[a]ll of this is totally untrue," and that Plaintiff believed that her supervisor, Ms. Buckman, was simply a bad supervisor who was out to get her. *Id.* At the conclusion of this meeting, Luna presented Plaintiff with the termination letter, which had been prepared prior to the meeting and signed by Executive Director Duncan. Def.'s Mem. 6. According to Defendant, although Duncan had signed the letter terminating Plaintiff, Luna had the authority to decide whether or not to present the termination letter to Plaintiff, depending on how the meeting went. Def.'s Mem. 5.

Plaintiff's account of the April 19 meeting is substantially different. The difference most germane to the instant proceedings is that Plaintiff claims that as soon as she walked into the HR department, Morgan said, "Juanita I'm really sorry" and handed Plaintiff the letter of termination and the Group II notice at or about the same time. Pl.'s Opp'n 4; Carpenter Dep. 63:5 to 8 and 66:15 to 16. Notably, Plaintiff alleges that she received her termination notice at the outset of

the meeting, before receiving any meaningful opportunity to be heard.[5] Unfortunately, the meeting was not recorded, and no minutes or records were kept. Luna Dep. 26:12.

In its Reply, Defendant cites two cases from the United States Court of Appeals for the Fourth Circuit, *Vance v. Chester County Board of School Trustees*, 504 F.2d 820, 825 (4th Cir. 1974) and *Linton v. Frederick County Board of County Commissioners*, 964 F.2d 1436 (4th Cir. 1992), for the proposition that the timing dispute outlined above is irrelevant. That is, Defendant argues that no due process violation occurs just because an employer decides to terminate an employee before providing the employee with an opportunity to tell her side of the story. Having considered the cases on the matter, I do not find Defendant's argument to be compelling; I find instead that Plaintiff was due a pretermination hearing—even if brief and inelegant—and the factual dispute before the Court is therefore genuine and material.

*Vance* is distinguishable on its facts.[6] Mrs. Vance was a public elementary school teacher who alleged a due process violation when the school district did not renew her contract for the 1971–72 school year. *Vance*, 504 F.2d at 823. In balancing the public and private interests at stake, the Fourth Circuit paid particular attention to the fact that the relevant period of employment for Mrs. Vance was "the *subsequent* 1971–72 school year, which was yet to come." *Id.* at 825 (emphasis added). Mrs. Vance suffered no interruption of her 1970–71 contract, and indeed the defendant never even contemplated such an interruption. *Id.* Accordingly, Mrs. Vance experienced "not even a temporary interruption of income, without notice or hearing,

[5] Defendant argues that Carpenter's testimony regarding when she received the termination letter was equivocal. Def.'s Reply 4. Specifically, Carpenter testified that "my termination letter I think [Luna] handed to me first, and then the group action followed." Carpenter Dep. 66. When asked if she was certain of that order, Carpenter responded with "[w]ell, I was handed—one or the other came first and second. It was all in the course of . . . [b]eing terminated . . . ." *Id.* Defendant argues that such testimony is actually consistent with the testimony of Luna and Morgan. I cannot agree. While Plaintiff's testimony is not exactly teeming with certitude, I find that it is enough to support Plaintiff's assertion that she got the termination letter at or about the same time as her Group II notice.

[6] Moreover, *Vance* came down some ten years before the United States Supreme Court's discussion in *Loudermill*, wherein the Court emphasized the need for pretermination hearings in the public employee context.

from the County Board's initial action on March 8, 1971 and the subsequent May 10, 1971 evidentiary hearing." *Id.* Unlike Mrs. Vance, however, the Plaintiff in the case before the Court suffered immediate income effects from her termination.

Moreover, in undertaking a public-private interest balancing like that in *Vance*, I conclude that Plaintiff's interest in being heard *before* termination outweighs RRCSB's interest in expeditiously removing an unsatisfactory employee. This is especially true when, accepting Plaintiff's version of the meeting, as I must, RRCSB could have waited just thirty minutes (or even less) before giving Plaintiff her termination notice. That thirty minute timeframe is rather inconsequential from an employer's perspective, but to an employee who is about to be terminated, it could make all the difference, i.e., it is the employee's chance to be heard and dispute the allegations against her.

*Linton* is also distinguishable from the instant matter. In *Linton*, the Chief of the Highway Operations Division of Frederick County (Maryland) was met by his superiors after he returned from vacation. *Linton*, 964 F.2d at 1437. Linton's superiors proceeded to question him about a recent site complaint issued by the Maryland Department of Natural Resources for unpermitted work performed in state waters. *Id.* Linton responded by saying that he had heard about the site complaint, but that the complaint was unjustified. *Id.* Linton's superiors then handed him a notice of dismissal. *Id.* Linton was given one night to decide whether he would rather resign or be fired; he chose the latter. *Id.*

The Fourth Circuit found that the "explanation given Linton satisfied the objective of pretermination process to provide 'an initial check against mistaken decisions.'" *Id.* at 1440 (quoting *Loudermill*, 470 U.S. at 545). The court further noted that "[t]he ability of

pretermination process to avoid mistake was bolstered by the overnight period . . . when Linton was given the opportunity to consider whether to resign." *Id.*

Unlike the Plaintiff in the case before the Court, Mr. Linton did not dispute his superiors' version of the pertinent events. Most notably, he admitted to receiving his notice of termination *after* being confronted with the recent site complaints and having an opportunity respond to them.

Defendant, in its Memorandum, went on to cite cases from First, Eighth, and Ninth Circuit Courts of Appeals finding that the timing of a termination notice is not always a dispositive issue. *See O'Neill v. Baker*, 210 F.3d 41, 49 (1st Cir. 2000) ("There is no constitutional infirmity because the planned termination was subject to revision if [the plaintiff] was able to contest the validity of the grounds for termination. Instituting termination proceedings and preparing the necessary documentation in advance of the final pre-termination hearing are not deprivations of due process rights."); *Jackson v. St. Joseph State Hosp.*, 840 F.2d 1387, 1391 (8th Cir. 1988) ("Due process . . . does not require predecision hearings. It only requires an opportunity to be heard prior to the termination of *benefits*.") (emphasis added); *accord Bignall v. N. Idaho Coll.*, 538 F.2d 243, 246 (9th Cir. 1976). Defendant asks the Court to adhere to the foregoing treatment, and treat the timing dispute as irrelevant because Carpenter was paid through—and including—April 19, 2010, the day of her hearing. *See* Def.'s Reply Ex. 1 (Duncan Supp. Decl.). The Fourth Circuit, however, has not adopted such a conception of "termination." *Cf. Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1463 n.7 (4th Cir. 1990) (assuming that the date of termination, for purposes of that case, was simply the date on which the plaintiff met with his superiors, and a termination decision was recommended). Defendant's

contention that Plaintiff was not technically "terminated" until the end of the workday because she was paid for the full day is unavailing.

In sum, the parties are at odds with respect to material facts concerning the timing of Plaintiff's notice. That is, Defendant's employees have testified that Luna withheld giving Plaintiff her termination notice until Plaintiff had been given ample opportunity to explain herself. Plaintiff, on the other hand, testified that she received the termination notice at or about the same time she received her second Group II notice. While nothing in the due process case law prevents an employer from terminating a public employee immediately after providing a hearing, it is legally insufficient to terminate an employee before such a hearing. The factual dispute over the circumstances surrounding Plaintiff's receipt of the termination notice, then, is sufficient for Plaintiff to succeed at the summary judgment stage.

**B. RRCSB Termination Policy**

Additionally, Plaintiff asserts that she was afforded no meaningful opportunity to be heard even if the Court accepts Defendant's factual characterization of the April 19 meeting. To this point, Plaintiff claims that RRCSB policy required Plaintiff's termination after the issuance of a second Group II notice. Pl's Opp'n 5. Although Luna claims that she was directed to give Plaintiff the Group II notice and *then* decide whether or not to proceed with termination, Plaintiff argues that Luna is not a decision maker with regard to terminations. Pl.'s Opp'n 6. Citing RRCSB policy, Plaintiff argues instead that only the Executive Director has final authority and responsibility for termination, based on the recommendations of the Division Director and the Director of Finance and Administration Services. *Id.* Given that the Division Director and the Director of Finance and Administration had already recommended termination, and the Executive Director had already signed a termination letter, Plaintiff posits that even if Luna was

supposed to—and indeed, even if she did—wait to give Plaintiff her termination letter until the April 19 meeting had ended, Luna had no authority to change the termination decision and had been given no instructions on how to proceed if she wanted to. *Id.* Moreover, Plaintiff cites Luna's deposition testimony for the proposition that Group II notices are only discussed with the employee *after* they are given, Pl's Resp. 3, so therefore Plaintiff's fate with RRCSB was sealed as soon as her second Group II notice was issued. In sum, Plaintiff insists that a reasonable jury could conclude that no RRCSB representatives at the April 19 meeting had the authority to change or suspend the termination decision, and the meeting was therefore a "sham proceeding" because the decision to terminate Plaintiff had been irrevocably made prior to the meeting.

Defendant replies by stating that Luna was authorized by Duncan to handle the April 19 meeting and actually could decide to not go ahead with the termination if she found reason for RRCSB to reevaluate the situation. *See* Duncan Decl. ¶ 5. Defendant also argues that Luna's position description states that she, as Human Resources Manager, "conducts approved terminations," Def.'s Reply Ex. 2, so she therefore had decision making power over the April 19 meeting.

While Plaintiff "may not rest upon mere allegations or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial," *Rivanna Trawlers, Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988), I find that Plaintiff has alleged sufficient facts to survive summary judgment. First, although Duncan's Declaration indicates that he delegated his termination authority to Luna on April 19, the RRCSB Policy Manual is unequivocal. It states that "Two Group II Offenses results in termination," and in my view, that fact could persuade a reasonable jury to conclude that neither Luna nor Morgan had any power to change or suspend the termination decision even if they gave Plaintiff an

opportunity to be heard. Moreover, the mere fact that the HR Manager, pursuant to her job description, *conducts* approved terminations does not necessarily imply that she had any authority to *change* the approval status of such terminations. That job description, to the contrary, can be read to mean that the HR Manager, in the most ministerial fashion, just carries out the termination orders from the Executive Director. It is unclear, from evidence before the Court, whether Carpenter's termination was set in stone when she entered the room on April 19, 2010. It might be true that the RRCSB policy manual asserting that two Group II notices requires termination is inflexible, as Plaintiff claims, or it might be true that Luna had discretion in the meeting, as Defendant claims. The relevant deposition excerpts stop short of providing a definitive answer, and this disputed material fact is best left to a jury.

**C. Post-Termination Due Process**

In addition to the pretermination arguments discussed above, Plaintiff alleges that her post-termination due process rights were violated because Defendant failed to comply with Virginia law governing grievance procedures. *See* Am. Compl. ¶¶ 12–13, 16. In its Memorandum in Support of its Motion for Summary Judgment, Defendant states that RRCSB had established a grievance procedure pursuant to Va. Code § 15.2–1506, and further notes that Duncan terminated the grievance procedure, but Plaintiff did not elect to appeal the decision. Def.'s Mem. 7, 12. Neither party, however, discusses the matter any further in their recent filings, and arguments at the November 14 hearing did not touch on this issue. The arguments set forth in Defendant's Memorandum, Plaintiff's Response, and Defendant's Reply focus solely on the adequacy of pretermination proceedings. For the sake of completeness, however, I discuss the law on post-termination due process, and I conclude that even if the Court accepts

Plaintiff's allegation, no due process violation occurred. I will therefore grant summary judgment in favor of the Defendant on this issue.

Perhaps giving rise to Plaintiff's assertion that her due process rights were violated when Duncan failed to give her notice of the termination of her grievance, the Supreme Court in *Loudermill* concluded by stating that "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures *as provided by the Ohio statute*." *Loudermill*, 470 U.S. at 547–48 (emphasis added).

Plaintiff notes that after her termination, she filed a grievance and proceeded through the third step of the RRCSB grievance procedure, but the termination was upheld at all steps. When Plaintiff sought to undertake step four, and asked that her grievance be sent to an impartial Hearing Officer, Executive Director Duncan terminated her process because Plaintiff had failed to comply with required response timelines. Plaintiff asserts that Duncan's actions contravened Va. Code § 15.2–1507(7)(a), requiring that Plaintiff get written notification of an alleged timeliness violation. Plaintiff asserts that she was due five workdays from the receipt of such notification to correct her noncompliance, but Duncan did not provide any such notification.

Virginia Code Section 15.2–1507(5) outlines the grievance procedure that RRCSB admits it has adopted. Section 15.2–1507(5) states that "[e]ach grievance procedure shall include not more than four steps for airing complaints at successively higher levels of local government management, and a final step providing for a panel hearing or a hearing before an administrative hearing officer upon the agreement of both parties." *Id.* at § 15.2–1507(5)(a). Moreover, grievance procedures are required to prescribe "reasonable and specific time limitations for the grievant to submit an initial complaint and to appeal each decision through the steps of the grievance procedure." *Id.* at § 15.2–1507(5)(b).

> [F]ailure of either party to comply with all substantial procedural requirements of the grievance procedure . . . without just cause shall result in a decision in favor of the other party on any grievable issue, *provided the party not in compliance fails to correct the noncompliance within five workdays of receipt of written notification by the other party of the compliance violation*."

*Id.* at § 15.2–1507(7)(a) (emphasis added).

Plaintiff alleges that Duncan—without giving her the notice set forth by the Virginia Code Section quoted above—terminated her grievance procedure at the fourth stage for her failure to comply with required response timelines. Duncan's actions, if true, appear to contravene Virginia statutory requirements.

That contravention, however, is insufficient to establish a due process violation. In *Riccio*, 907 F.2d at 1466–69, the Fourth Circuit painstakingly discussed how the Supreme Court's decision in *Loudermill* undermined the Fourth Circuit's prior holding in *Kersey v. Shipley*, 673 F.2d 730 (4th Cir. 1982) regarding the effects of state law on due process requirements. In *Kersey*, the Fourth Circuit stated that the plaintiffs "were denied due process under the Fourteenth Amendment *only if they were deprived of the benefits conferred by [the Law-Enforcement Officers' Procedural Guarantees found in] Va. Code § 2.1–116.1 et seq. (1979)*." *Kersey*, 673 F.2d at 732 (emphasis and alteration added).

Eight years later, however, in *Riccio*, the Fourth Circuit noted that after *Loudermill*, it became clear that "[t]he right to due process 'is conferred, not by legislative grace, but by constitutional guarantee.'" *Riccio*, 907 F.2d at 1467 (quoting *Loudermill*, 470 U.S. at 541). As such, the *Riccio* court held that the police department's "violation of the Law-Enforcement Officers' Procedural Guarantees does not necessarily compel a finding of a due process violation." *Id.* at 1468. Finally, the court noted that "hold[ing] that a state violates the Due Process Clause every time it violates a state-created rule regulating the deprivation of a property

interest would contravene the well recognized need for flexibility in the application of due process doctrine." *Id.* (citing *Mathews*, 424 U.S. at 334).

In sum, Plaintiff's claim that RRCSB violated her post-termination due process rights because Duncan allegedly violated state statutory law by failing to give Plaintiff notice that she was untimely in her grievance filings is without merit. Although the parties only incidentally raise the point in their filings, I will grant partial summary judgment in Defendant's favor on Plaintiff's post-termination claim.

## IV. CONCLUSION

Defendant argues that the material facts are not in dispute, but I find to the contrary. First, Plaintiff and Defendant assert different accounts of the April 19, 2010 meeting that resulted in Carpenter's termination. Exactly when Carpenter's superiors presented her with a termination notice bears on the question of whether or not the April 19, 2010 meeting passed due process muster. Also, Plaintiff has presented evidence that would allow a reasonable jury to conclude even if Carpenter's superiors did give her the termination notice at the end of the April 19 meeting, that meeting did not afford Plaintiff a legitimate opportunity to be heard because the termination decision was irrevocably made before the meeting. Plaintiff's pretermination due process claim survives summary judgment, and I will deny Defendant's Motion in part.

Finally, while not substantially argued in the parties' filings, Plaintiff baldly states that Defendant violated *Loudermill's* post-termination due process requirements by not complying with the Virginia Code Section governing post-termination grievance procedures. Plaintiff's position is not supported by law, and I will grant partial summary judgment in favor of the Defendant on this issue.

The Clerk of the Court is directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this 29th day of November, 2011

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE